**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JUDGE KOCORAS

MAGISTRATE SIDNEY I. SCHENKIER

| | |
|---|---|
| TAMI REMIEN and DEBRA FLETCHER, on behalf of themselves and all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| EMC CORPORATION, | ) ) |
| Defendant. | ) ) |

04C 3727

No.

Jury Trial Demanded

FILED-5-24
04 MAY 28 PM 4:04
CLERK U.S. DISTRICT COURT

**COMPLAINT**

Plaintiffs, Tami Remien and Debra Fletcher, on behalf of themselves and all others similarly situated, by and through their attorneys, Stowell & Friedman, Ltd. for their Complaint against Defendant EMC Corporation ("EMC") state as follows:

DOCKETED
JUN 0 1 2004

**JURISDICTION**

1. Jurisdiction is based on 28 U.S.C. §§1331 and 1343, and principles of pendent and supplemental jurisdiction.

**PARTIES**

2. Plaintiffs Tami Remien ("Remien") and Debra Fletcher ("Fletcher") are former employees of EMC. During their employment with EMC, Remien and Fletcher discharged all duties assigned to them competently and enjoyed excellent reputations with regard to the high quality of their work and with regard to their conscientious devotion to their jobs.

1-1

3. Defendant EMC is a leading producer of computer enterprise storage hardware, software, networks and services and sells the storage systems, software, networks and services to organizations and companies around the world.

4. EMC's corporate headquarters are located in Hopkinton, Massachusetts and it employs over 17,000 people worldwide. EMC employs individuals in at least 18 states in the United States and maintains more than 100 sales offices, including a Chicago, Illinois office.

## FACTUAL ALLEGATIONS

### EMC Systemically Discriminates Against Women

5. EMC has and continues to engage in a nationwide pattern and practice of discriminating against and harassing the female employees in its sales division and professional services division. EMC's unlawful conduct includes, but is not limited to systemic and pervasive sexual discrimination, unequal pay practices, and retaliation.

6. EMC's discrimination against women is evidenced by lack of hiring and retention of female employees. Notwithstanding the number of people EMC employs nationwide, its workforce is not diversified by sex. Upon information and belief, only one of EMC's fourteen senior-most executives is female. For further example, during Plaintiffs' employment in the Chicago, Illinois office, of approximately thirty sales people, the most female sales people employed at any one time was approximately six. Most recently, only two female sales people were employed in the Chicago, Illinois office. The composition of EMC's workforce is not the result of chance but is the result of intentional discrimination.

**Pattern Allegations**

7. During Plaintiffs' employment and before, EMC engaged in a pattern and practice of discriminatory conduct including, but not limited to:

    a.   failing to hire women;

    b.   failing to promote women;

    c.   underutilizing women;

    d.   engaging in occupational segregation;

    e.   taking into consideration sex, pregnancy, marital and parental status when making employment decisions such as hiring, training, promoting, transferring or assigning accounts, assigning sales territories, establishing production goals, and exercising managerial discretion;

    f.   failing to credit women for their experience on the same basis as men and failing to consider women for timely promotions or title changes on the same basis as men;

    g.   systematically paying women lower wages and/or denying women opportunities to increase their earnings, including base pay, commissions, bonus and stock options;

    h.   negligently hiring, retaining and promoting men with known propensities to discriminate against women or sexually harass them;

    i.   creating an environment that is hostile and offensive to women;

    j.   making significant employment decisions based on sex stereotypes;

k. defaming women to their clients, corporate partner relationship representatives and current and former coworkers, including, but not limited to when they leave EMC;

l. retaliating against women who complain of discrimination including subjecting them to further discrimination, retaliation, verbal attacks, reassigning their clients to male sales people, and constructively discharging or discharging them;

m. penalizing women for taking maternity leaves of absence.

**The Pattern of Discrimination and Retaliation**
**Transcends All Aspects of Employment**

8. The women who are employed by EMC are treated less favorably than the male employees. For example, women are denied opportunities and support, including account assignments and managerial support, which prevents them from reaching their full potential. Male salespeople are routinely assigned high-revenue generating accounts and provided with resources to help them generate sales, while women are ignored or actively prevented from generating sales. Female employees are subjected to stricter standards and goals than male employees and are demeaned by managers. EMC regularly denies female employees perks that would assist them in developing client relationships. EMC maintains stereotypical views about women that create an environment where occupational segregation, disparate treatment and harassment are not only condoned but also encouraged. For example, one female sales person who was requested by a client to work on an account was told that words to the effect that she was only requested to work on the account because of the way she looked. On another

occasion, a female employee was told that a lucrative account was going to be assigned to a man because "he has a family to feed," or words to that effect.

9. EMC's lack of respect for women is further evidenced by its fostering a work environment that is hostile and offensive to women. EMC tolerates sexual harassment by its male employees and its environment attracts prospective male employees who have a propensity to engage in sexual harassment. One of the most telling facts about EMC's view of women is that it was not until 2001 that EMC issued a formal announcement that the company would no longer reimburse client entertainment expenses for strip clubs. Women at EMC were often forced to accompany their male coworkers and clients to strip clubs or male-oriented dining establishments like "Hooters." One EMC manager was asked to leave a strip club in connection with a "lap dance" purchased for him by other EMC employees. Males routinely discuss these types of incidents in the workplace.

10. Complicit in EMC's pattern and practice of gender discrimination and harassment is its human resources group, which is ineffective at resolving complaints of gender discrimination and harassment so much so that many female employees recognize the futility of lodging internal complaints. EMC's human resource department and legal department vigorously defend discriminators and harassers and otherwise encourage EMC's standard operating procedure of retaliating against female employees who file complaints.

11. EMC does not foster an environment where women feel free to complain of discrimination or harassment. Instead, women often feel intimidated from coming forward and fear retaliation. For example, when EMC surveyed its employees regarding

satisfaction, it required complaining employees to state their position, gender and

manager. Because females make up an extremely low percentage of EMC's workforce,

women wishing to complain could not do so in a confidential manner (in the sales

division and professional services division, female employees rarely have other female

coworkers within their department).

12. As a result of the lack of opportunity for career advancement, the hostile

work environment, and the ineffective human resource department, EMC's female

employees frequently resign their employment. Others are terminated for pretextual

reasons.

**The Problems of Sexual Discrimination
at EMC Are National in Scope**

13. The named class representatives worked at EMC in the Chicago, Illinois

office. The class members who are relying on the class representatives to protect their

rights worked at EMC offices in additional states throughout the country.

**The Claims of the Class Representatives Demonstrate
the Necessity for and Appropriateness of Class Treatment**

14. The class representatives' experiences were remarkably similar. As stated

above, occupational segregation, wage discrimination, sex based denial of opportunity,

and retaliation were commonplace. Further, EMC was on notice of the scope of the

problem and actively participated in the wrongdoing.

*EMC Structure*

15. EMC is divided into several divisions, including the sales division and the

professional services division. Sales people are managed by a district manager and

sometimes report indirectly to a global account manager ("GAM"). District managers

6

report to an area manager and area managers report to a division vice president. Sales people are primarily compensated based on base pay, commissions, and bonuses from the sales of products or services as well as stock options.

16. The sales division and the professional services division are interrelated in many respects. For example, system engineers (employees of the professional services division who are now referred to as "CSLs") assist sales people by providing technical expertise about the products and services EMC offers. System engineers can be an invaluable resource for sales people because of their specific product knowledge and expertise. Until a relatively recent reorganization, systems engineers were managed by a management team that mirrors the current sales person management team (called system engineers management).

17. Consistent with the allegations of company-wide gender discrimination, women experience discrimination in the majority of EMC's offices, with the Chicago, Illinois office in particular having long been a bastion of discrimination against women. Women in the Chicago office, in contrast to their male peers, have been consistently underrepresented, underutilized, denied support and income producing opportunities, ignored and/or demeaned, and otherwise prevented from reaching the same level of success as men.

*Tami Remien*

18. Tami Remien began her employment with EMC in February 2001. At that time, Remien had significant experience working in the sales field. Upon joining EMC in February 2001, Remien initially worked under Debra Fletcher ("Fletcher"). In approximately July 2001, Remien was transferred to District Manager Rick Otten

7

("Otten"). Remien worked for Otten until she was discriminatorily relieved of her only

account and other duties (a process which began in December 2002 and was completed in

January 2003). For several months, Remien was not assigned to a manager, sales

territory or accounts. As a result of this and the discriminatory conduct described in this

Complaint, Remien was forced to resign in December 2003.

19. Throughout her employment with EMC, Remien was denied opportunities

and support, including account assignments, adequate assistance from a systems engineer

and managerial support that prevented her from reaching her full potential; had she been

given the same opportunities as male sales people, she would have attained a much

higher level of success.

20. Consistent with EMC's pattern of harassment and gender discrimination,

EMC management treated Remien and other female sales persons as if they were inferior

to their male counterparts, in part by directing income-generating opportunities

exclusively to men. Managers such as Otten and area manager Steve Crowe ("Crowe")

exercised total discretion with respect to which sales people were assigned which

accounts, and routinely assigned high-revenue accounts to men and left women with

inferior accounts with no potential.

21. Remien was specifically hired to work on the Motorola sales account, which

was divided into two primary portions – the "GIS" portion and the "Engineering"

portion. The GIS portion was far more lucrative for EMC and the sales person

responsible for this part of the account. Prior to Remien's hiring, two male sales people

had been assigned to the Engineering portion of the account for one year each

consecutively; however, neither had made any sales on that portion of the account. Remien was hired to work on the Engineering portion of the account.

22.     Demonstrating her ability as a sales person, Remien arranged for a sale of products and services on the Engineering portion of the Motorola account within approximately the first three months of her employment. When the male sales person assigned to the more lucrative GIS portion of the Motorola account resigned in approximately June 2001, Remien sought that portion of the account. Instead of consolidating the account under Remien, EMC management assigned the GIS portion of the account to a male sales person. Consistent with EMC's stereotypical views of women, Remien was told that she would not smoke, drink, swear, hunt, fish and tolerate strip clubs and, therefore, she did not fit the job description for the GIS account sales person.

23. Further, when the male sales person assigned to the GIS portion of the account was unable to find new opportunities, Remien was forced to give up part of her territory to him.

24. Approximately one year later, in May 2002, it was rumored that EMC planned to consolidate the Motorola account under one sales person. Shortly before the consolidation and resulting layoff was to take place, the male sales person assigned to the GIS portion of the account resigned. Remien managed both portions of the account effectively for approximately three weeks. Instead of consolidating the account under Remien permanently, however, EMC management rehired a recently laid off male sales person with no experience on the Motorola account to work on the Motorola account. When Remien asked Otten to return to her the part of her territory she had given up,

Otten refused stating words to the effect of "I can do whatever I want." EMC management helped the male sales person become successful and generate income by promoting him in meetings with Motorola and introducing him to potential clients at Motorola and elsewhere.

25. In September 2002 Remien raised her concerns regarding discriminatory treatment with the human resources department. Instead of investigating and taking remedial action in response to Remien's internal complaints, EMC retaliated against Remien by removing her completely from the Motorola account in and continuing to deny her the assistance and support necessary to succeed.

26. Despite the fact that Remien succeeded where others had failed, EMC management removed her from the Motorola account entirely in January 2003; EMC never provided a legitimate, non-discriminatory explanation for this adverse employment action.

27. After Remien learned she was being removed from the Motorola account, she requested assignment of additional accounts. However, as further evidence of discrimination, Remien was referred only "dead end" accounts (i.e., accounts that had no potential to produce sales, including accounts which other sales people had explored and been unable to make sales).

28. Upon completing the transition of the Motorola account to the male sales person, Remien was informed the accounts to which she had been assigned in place of Motorola no longer existed. Remien essentially was baited into transitioning the Motorola account with other accounts that never materialized.

29. In approximately January 2003, Otten informed Remien she had been reassigned to another district. Prior to the announcement, however, neither Remien nor her purported new district manager was notified. From January 2003 until she was constructively discharged, Remien was never officially assigned a new district manager.

30. In addition to the managerial discretion in assigning accounts, EMC managers also exercise discretion with respect to assigning resources such as the assistance of a system engineer. Like many women at EMC, Remien was denied such assistance. For example, while Remien was still assigned to Motorola, she arranged for a product evaluation "on the floor" at Motorola. Essentially an "on the floor" evaluation was an opportunity for EMC to install its products and demonstrate how its products and services could benefit Motorola. Assuming the evaluation went well, the products remained in place and EMC made a sale. In this case, the sale would have been approximately $1.5 million and likely would have led to future sales.

31. Remien's area manager told her that if she arranged to have the product evaluated on the floor, he would ensure she received the support necessary to complete the sale. However, EMC failed to provide Remien sufficient support (i.e., from systems engineers, other professional services employees, and management) and the sale fell through.

32. EMC lost the majority of work associated with the Engineering portion of the Motorola account due to technical problems and Remien lost significant commissions.

33. Unlike Remien's experience, when male sales people arranged for "on the floor" product evaluations, they received support necessary to complete such significant sales, including support from systems engineers, professional services employees and

11

management, up to and including the national vice president of sales. For example, when a male sales person arranged for an "on the floor" evaluation with the W.W. Grainger account, numerous management employees from the sales and professional services divisions – including a division vice president – visited the facility to ensure the products worked effectively and that the sale went through. Another male received similar support in connection with the CNA Insurance Account. Women at EMC were consistently denied such support.

34. Additionally, EMC managers routinely made derogatory gender-based comments towards Remien. For example, Otten told Remien and other women that their financial and technical skills were pathetic and that women were only good at the "relationship" part of sales. Otten also allowed a male employee to essentially "steal" commissions from Remien.

35. Likewise, Otten and previous managers intimidated Remien and other female employees by shouting obscenities at them, interrogating them to the point of emotional exhaustion, and calling them stupid. Remien was often the target of violent, profanity-laced and gender-based tirades from males in the office, including all sales management in the Chicago office. Male sales people were not treated similarly. Otten's discriminatory animus was made clear through overt and covert actions indicating that female employees were not wanted or valued in the office.

36. Despite the discriminatory treatment, Remien repeatedly requested additional accounts, but EMC continued its pattern and practice of discrimination and retaliation, giving lucrative accounts to men, leaving Remien with difficult, non-revenue generating accounts (when she was assigned any).

12

37. EMC took other actions intended to cause harm to Remien's reputation and career. For example, upon information and belief, Otten made remarks questioning Remien's abilities in a discussion with one of Remien's clients, clearly implying that Remien was not competent. Otten also made false comments to EMC management regarding Remien's abilities (for example, by questioning the truthfulness of reports she prepared) and effectively "poisoned" EMC management from viewing Reimen's performance in a non-discriminatory manner.

38. As a result of the aforementioned discriminatory treatment – including being denied income-generating opportunities, managerial support and suffering harassment and retaliation – Remien was constructively discharged in December 2003.

***Debra Fletcher***

39. Debra Fletcher ("Fletcher") was hired by EMC as an account representative in October 1999. At that time, she had significant experience working in the sales field. Shortly after she was hired, Fletcher was given the responsibilities of a district manager and global account manager, both of which were higher level positions than account representative. Notwithstanding her added duties, Fletcher was compensated as an account representative for business closed in Chicago and Phoenix and not compensated globally as agreed upon when she accepted the unofficial global account manger role.

40. From approximately July 2001 until approximately May 2002, Fletcher worked formally in the position of global account manager, and from approximately June 2002 until June 2003, Fletcher worked as a sales person under Otten. Immediately prior to her constructive discharge in July 2003, Fletcher worked for approximately one week as a Business Development Manager reporting to Ken Groehe ("Groehe").

41. Despite her commendable performance in each of these positions, Fletcher's income decreased each year of her employment as a result of EMC's sexual discrimination and retaliation.

42. As described above, under Otten, male sales people were routinely assigned high-revenue generating accounts and provided with resources to help them generate sales, while females were, at best ignored, and at worst, actively prevented from generating sales. For example, while Fletcher was acting as a global account manager and district manager in approximately May 2001, she closed a sale of approximately $6 million dollars worth of products and services. Despite her official status as a sales person, Fletcher was informed that she would not be credited with the sale because she was acting as a district manager and global account manager. EMC management told Fletcher that she should assign the credit to a male sales person because "he has a family to feed," or words to that effect. Although Fletcher was eventually allowed to assign credit to two female sales people, she was denied credit as their acting district manager as well.

43. In addition to being denied compensation, Fletcher was also removed from a significant account and from her position as global account manager based on her gender. Specifically, in approximately March 2002, EMC removed Fletcher from a lucrative account and her position after she was falsely accused of having a romantic, sexual relationship with a client representative (the accusations appeared in an unverified, unreliable industry "report" posted on the internet). EMC refused to take any action to support Fletcher and enable her to keep the account even after she asked EMC management for assistance.

14

44. This same "report" also accused EMC of entertaining clients at strip clubs. In response to her complaints about being removed from the account, Fletcher was told that because the part of the report accusing EMC of entertaining clients at strip clubs was true, there was nothing EMC could do on her behalf. The Company had, in fact, entertained client representatives at strip clubs.

45. As a result of the false allegations mentioned above, Fletcher was subjected to phone calls and comments from clients and coworkers teasing her for purportedly sleeping with client representatives to obtain business. EMC refused to take any action within EMC to notify its employees that the allegations lodged against Fletcher were false or to stop EMC employees from spreading the false allegations.

46. Fletcher's coworkers also harassed her at out-of-town company business meetings. For example, on more than one occasion, Fletcher's intoxicated coworkers (who were staying in the same hotel as Fletcher as part of the business meeting) called her hotel room so many times she had to ask the hotel to block calls to her room. Fletcher's coworkers left offensive and harassing voicemail messages with sexual innuendos and comments.

47. Fletcher also experienced discrimination from other managers. When she interviewed internally for a Business Development Manager position, the EMC manager interviewing Fletcher asked if she was "tough enough" to "get in guys' faces," or words to that effect. The interviewer also questioned Fletcher why she needed to work given that she was married. Additionally, Fletcher's interviewer also explained that he "must be a safe haven for women" and that he "had to hire" Fletcher because she "was a woman," or words to that effect. Fletcher was offered the position and initially accepted,

hoping that treatment would be different under a different manager. However, after

reflecting on the comments in her interview and the discriminatory treatment she had

endured over the years, Fletcher decided she could not continue to work in such a hostile

and discriminatory environment.

48. While employed by EMC, Fletcher complained about much of the

aforementioned conduct. For example, Fletcher complained to her former area manager

about Otten's conduct. Additionally, she complained about being denied compensation

for the sale she closed and about being removed from an account.

49. EMC essentially ignored Fletcher's pleas for assistance. In fact, instead of

investigating and taking remedial action in response to Fletcher's internal complaints,

EMC retaliated against Fletcher by continuing to deny her the assistance and support

necessary to succeed. Otten continued to remove accounts from Fletcher, thereby

decreasing her territory, and assigned those accounts to male sales people, leaving

Fletcher with only difficult, non-revenue generating accounts.

50. As a result of the aforementioned treatment, Fletcher was constructively

discharged.

**EMC was Aware of the Conduct of its Employees and**
**Failed to Prevent Sexual Discrimination and Retaliation**

51. EMC's management directed, encouraged and participated in the above-

described unlawful conduct. Indeed, EMC's President & CEO Joseph Tucci ("Tucci") is

aware of EMC's problem retaining women. At a conference, Tucci noted that EMC had

not met its goal of increasing the number of female employees because EMC could not

retain female employees.

52. Further, EMC allowed the discrimination and retaliation to go unremedied for so long that it amounts to a policy or practice and constitutes EMC's standard operating procedure. Finally, EMC's Human Resource and Legal Departments failed to take appropriate remedial action and, in effect, aided and abetted in the unlawful conduct.

**The Discrimination and Retaliation Are Ongoing**

53. The discrimination and retaliation described above are ongoing as a continuing violation of the civil rights laws.

**Timely Representative Charges of Sexual Discrimination,**
**Sexual Harassment and Unlawful Retaliation Were Filed with**
**the Equal Employment Opportunity Commission**

54. Timely representative charges of sexual discrimination, sexual harassment and unlawful retaliation were filed with the Equal Employment Opportunity Commission ("EEOC"). The EEOC has issued Notices of Right to Sue.

**Plaintiffs Suffered Extreme Emotional Distress**

55. By the acts and conduct described above, EMC intended to cause Plaintiffs severe emotional distress, or acted in reckless disregard that its actions had caused and would cause Plaintiffs such injury.

56. Plaintiffs suffered severe emotional and mental distress as a direct and proximate result of the conduct of EMC.

57. The acts and conduct of EMC constitute extreme and outrageous conduct beyond the bounds of common decency.

**Plaintiffs were Injured as a Consequence**
**of Defendant's Unlawful Conduct**

58. Plaintiffs lost wages and other benefits, suffered embarrassment and humiliation and their careers were irreparably injured as a result of EMC's conduct.

17

Plaintiffs suffered loss of enjoyment of life, inconvenience and other nonpecuniary losses as a direct result of EMC's conduct.

## CLASS ALLEGATIONS

59. The class of female employees and former employees who have been subjected to discrimination by Defendant due to their sex and have been subject to retaliation due to their opposition to discrimination is so numerous that joinder of all members is impracticable.

60. There are questions of law and fact common to the class.

61. The claims of the representative parties will fairly and adequately protect the interests of the class.

62. The questions of law and fact common to the members of the class predominate over any questions affecting only individual members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## COUNT I

## SEXUAL DISCRIMINATION IN VIOLATION OF TITLE VII

63. Plaintiffs and all others similarly situated reallege paragraphs 1 through 62 and incorporate them by reference as paragraphs 1 through 62 of Count I of this Complaint.

64. Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq., as amended by the Civil Rights Act of 1991, ("Title VII") makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment on the basis

of sex. Plaintiffs and all others similarly situated were subjected to unlawful discrimination.

65. Title VII also prohibits sexual harassment. Sexual harassment that creates an abusive and hostile work environment, such that the conditions of employment are altered, is actionable under Title VII as sexual discrimination.

66. EMC is liable for the acts alleged herein because EMC's top echelon established the corporate culture at EMC which encouraged sexual harassment. EMC has allowed the discrimination and harassment alleged herein to go unremedied for so long that it amounts to a policy or practice and constitutes EMC's standard operating procedure.

67. By its conduct described herein, EMC subjected Plaintiffs and all others similarly situated to sexual discrimination including sexual harassment in violation of Title VII.

## COUNT II

### WAGE CLAIMS
### IN VIOLATION OF THE EQUAL PAY ACT AND TITLE VII

68. Plaintiffs and all others similarly situated reallege paragraphs 1 to 67 and incorporate them by reference as paragraphs 1 to 67 of Count II of this Complaint.

69. The Equal Pay Act of the Fair Labor Standards Act, 29 U.S.C. Section 206 and 207, makes it unlawful for an employer on the basis of sex to pay lower wages or fringe benefits to employees of one sex than it does to similarly situated employees of the other sex. Title VII also makes it unlawful to discriminate in the payment of wages on the basis of sex.

70. Plaintiffs and all others similarly situated were paid lower wages than male employees in substantially equal jobs even though Plaintiffs and all others similarly situated performed similar duties requiring the same skill, effort, and responsibility of male employees.

71. The differential in pay between sexes was not pursuant to seniority, merit, quantity or quality of production, but was due to sex.

72. EMC intentionally paid Plaintiffs and all others similarly situated less than it paid male employees who were performing substantially equal work.

73. By its conduct as alleged herein, EMC discriminated against Plaintiffs and all others similarly situated with respect to their wages in violation of the Equal Pay Act and Title VII.

## COUNT III

### RETALIATION
### IN VIOLATION OF TITLE VII AND THE EQUAL PAY ACT

74. Plaintiffs and all others similarly situated reallege paragraphs 1 to 73 and incorporate them by reference as paragraphs 1 to 73 of Count III of this Complaint.

75. Title VII, specifically 42 U.S.C. 2000e-3, makes it unlawful for an employer to discriminate against an employee who has opposed an unlawful employment practice or has assisted or participated in another employee's claim of discrimination. In addition, the Equal Pay Act and Fair Labor Standards Act, 29 U.S.C. Section 215(a)(3), make it unlawful for any person to discharge or in any manner discriminate against any employee because she complained of wage discrimination.

76. Plaintiffs and all others similarly situated complained of sex discrimination and unfair wage practices.

20

77. EMC retaliated against Plaintiffs and all others similarly situated for their complaints in violation of the anti-retaliation provisions of Title VII and the Equal Pay Act. By its conduct, EMC subjected Plaintiffs and all others similarly situated to unlawful retaliation in violation of Title VII and the Equal Pay Act.

## COUNT IV

### LIBEL PER SE

78. Plaintiffs and all others similarly situated reallege paragraphs 1 to 77 and incorporate them by reference as paragraphs 1 to 77 of Count IV of this Complaint.

79. The statements made by employees of EMC under the direction and with the assistance of EMC's managers, as alleged herein, including statements about Plaintiffs' professional ability and misrepresenting the reasons for Plaintiffs' and all others similarly situated separation from EMC, are all false, misleading and defamatory. Each such statement accuses Plaintiffs and all others similarly situated of want of ability and want of integrity in their professions, and are libel per se.

80. The statements were made with knowledge that they were false and with actual and common law malice for the purpose of destroying Plaintiffs' exemplary reputations.

81. Although damages are presumed, Plaintiff Remien and all others similarly situated have suffered monetary loss as a result of the defamatory statements.

82. EMC is liable under the theory of respondeat superior.

## COUNT V

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

83. Plaintiffs and all others similarly situated reallege paragraphs 1- 82 and incorporate them by reference as paragraphs 1-82 of Count V of this Complaint.

84. EMC's actions through its agents against Plaintiffs and all others similarly situated constitute conduct so outrageous in character and so extreme in degree as to be beyond all possible bounds of decency, and to be atrocious, and utterly intolerable in a civilized society.

85. EMC, through its agents, intended to cause Plaintiffs and all others similarly situated severe emotional distress and/or knew that there was a high probability that its conduct would cause severe emotional distress.

86. EMC directed, encouraged, and participated in the wrongful conduct alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and all others similarly situated respectfully request that this Court find in their favor and against Defendant as follows:

a.     Declare that the acts and conduct of EMC violate Title VII of the Civil Rights Act of 1964 and 1991, the Equal Pay Act, and the anti-retaliation provisions of those laws;

b.     Declare that the acts and conduct of EMC violate Illinois common law;

c.     Award Plaintiffs and all others similarly situated the value of all compensation and benefits lost as a result of Defendant's unlawful conduct;

d.      Award Plaintiffs and all others similarly situated the value of all compensation and benefits they will lose in the future as a result of Defendant's unlawful conduct under Title VII, the Equal Pay Act, and Illinois common law;

e.      In the alternative to paragraph (d), reinstate Plaintiffs and all others similarly situated with appropriate promotions and seniority and otherwise make Plaintiffs and all others similarly situated whole;

f.      Award Plaintiffs and all others similarly situated compensatory damages under Title VII, and Illinois common law;

g.      Award Plaintiffs and all others similarly situated punitive damages under Title VII, for retaliation under the Equal Pay Act of the Fair Labor Standards Act, and Illinois common law;

h.      Award Plaintiffs and all others similarly situated liquidated damages under the Equal Pay Act;

i.      Award Plaintiffs and all others similarly situated presumed damages for defamation;

j.      Award Plaintiffs and all others similarly situated prejudgment interest;

k.      Award Plaintiffs and all others similarly situated reasonable attorneys' fees, costs and disbursements; and

23

l.     Award Plaintiffs and all others similarly situated such other relief as this

Court deems just and proper.

Respectfully submitted,

STOWELL & FRIEDMAN, LTD.

By     *Mary Stowell*

Mary Stowell

Mary Stowell
Linda D. Friedman
**STOWELL & FRIEDMAN, LTD.**
321 S. Plymouth Court
Suite 1400
Chicago, Illinois 60604
Phone: (312) 431-0888
Fax:    (312) 431-0228

24

UNITED STATES DISTRICT **04C**
NORTHERN DISTRICT OF ILLINOIS

JUDGE KOCORAS
**3727**

# Civil Cover Sheet
MAGISTRATE SIDNEY I. SCHENKIER

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

| | |
|---|---|
| **Plaintiff(s):** Tami Remien and Debra Fletcher, on behalf of themselves and all others similarly situated | **Defendant(s):**EMC Corporation |
| County of Residence: Cook | County of Residence: |
| Plaintiff's Atty: Mary Stowell and Linda D. Friedman Stowell & Friedman, Ltd. 321 S. Plymouth Ct., Suite 1400, Chicago, Illinois 60604 312-431-0888 | Defendant's Atty: |

FILED-ED4
04 MAY 28 PM 4:04
CLERK
U.S. DISTRICT COURT

II. Basis of Jurisdiction:          **3. Federal Question (U.S. not a party)**

III. Citizenship of Principal Parties
(Diversity Cases Only)

**DOCKETED**
JUN 0 1 2004

Plaintiff:- **N/A**
Defendant:- **N/A**

IV. Origin :          **1. Original Proceeding**

V. Nature of Suit:          **442 Employment**

VI.Cause of Action:          **Gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq., as amended by the Civil Rights Act of 1991 and the Equal Pay Act of the Fair Labor Standards Act 29 U.S.C. Sections 206 and 207**

VII. Requested in Complaint
          Class Action: **Yes**
          Dollar Demand:
          Jury Demand: **Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature: *Mary Stowell*
Date: 5-28-04

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**          Revised: 06/28/00